NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0155n.06

No. 14-5430

FILED
Feb 27, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JOSHUA ROBERTS, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:     SUHRHEINRICH, CLAY, and ROGERS, Circuit Judges

SUHRHEINRICH, Circuit Judge.

Defendant-Appellant Joshua Roberts ("Defendant") appeals his conviction for conspiracy to possess with intent to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Defendant raises various challenges to evidence admitted at trial and statements made during trial. For the following reasons, we **AFFIRM** Defendant's conviction.

## I. BACKGROUND

In June 2011, during a card game in Knoxville, Tennessee, Dwayne Turner told Defendant and four other friends that they could "make 500 [dollars] off of an eight ball" in Johnson City, Tennessee. [1] An "eight ball" refers to one-eighth of an ounce, or approximately

---

[1] The original six members of the drug conspiracy were Defendant, Dwayne Turner, Marquesha Jones, Jamica Woods, Shanna Clark, and Marquez Holloway.

3.5 grams, of cocaine. It usually costs between $250 and $300. Defendant responded, "[W]e need to see what that's about."

Turner contacted Marquesha Jones, his paramour, after the card game. He asked Jones to accompany the group to Johnson City and rent hotel rooms in her name. She agreed in exchange for reimbursement and prescription pills. The group left Knoxville for Johnson City on the night of June 22, 2011. During the trip, Jones personally transported crack cocaine at Turner's request. The conspirators arrived in Johnson City "a little after midnight" on June 23. Jones paid for three rooms at a local Red Roof Inn, renting the rooms until June 24.

Testifying for the United States at Defendant's trial, Jones described the illegal activity that took place at the Red Roof Inn. Jones witnessed Defendant chop up crack cocaine with a razor blade and weigh it on a digital scale. She observed Turner sell crack cocaine from his room and send "customers" to the two other rooms to purchase drugs. Because some customers wanted to buy from only Turner, Defendant also brought crack cocaine to Turner's room, where Turner completed transactions and provided Defendant with the sale proceeds. The crack cocaine sold out by the evening of June 23, so Defendant, Jones, and two other conspirators drove back to Knoxville to resupply. The group returned to Johnson City that night.

On the morning of June 24, the conspirators shifted operations to a neighboring Motel 6 because Turner believed the Red Roof Inn was "getting too hot." Jones rented Rooms 109 and 231 at the Motel 6. Jones testified that she stayed at the Motel 6 that morning for only an hour and a half, before returning to Knoxville in order to go to work.

Motel 6 staff noticed "suspicious activity" and contacted the Johnson City Police Department that day, informing the department that Jones had rented two rooms and that several

individuals were staying in those rooms. Thomas Garrison, a Vice and Narcotics Investigator, went to the Motel 6 with Sergeant Eric Dougherty and Officer Mark Hollis.

Upon arriving at the motel, Investigator Garrison detected a "strong odor of marijuana" near Room 231. The officers approached the room in order to conduct a "knock-and-talk." Turner opened the door, and Investigator Garrison saw Defendant run into the bedroom adjacent to the hotel suite's living room. Turner attempted to slam the door shut as the officers pushed their way into the room. Defendant, Turner, and co-conspirators Jamica Woods and Shanna Clark were inside the room at the time of entry. Investigator Garrison immediately followed Defendant into the bedroom and placed him in handcuffs while the other officers secured the living room. Sergeant Dougherty conducted a pat-down of Turner and found a small bag of marijuana.

Investigator Garrison obtained Jones's phone number from Clark. He contacted Jones to ask for permission to search the room, but she represented herself to be Jones's sister. Investigator Garrison instead sought and received verbal consent to search the hotel room from Turner, and the subsequent search revealed four bags containing 67.51 grams of crack cocaine, two sets of digital scales, a razor blade, and a box of plastic sandwich bags used to package the drugs. After searching Room 231, the officers went to the hotel manager and looked through the hotel records, which indicated Jones had also rented Room 109. The officers obtained permission from hotel management to search that room, which was empty, and they found two bags containing a total of 23.46 grams of crack cocaine.

Defendant was indicted alongside some of his co-conspirators for conspiring to possess with intent to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), based on the discovery of crack cocaine in the two motel rooms. Four of his co-conspirators

pleaded guilty for their roles in the conspiracy; charges against a fifth co-defendant, Marquez Holloway, were dismissed. Defendant pleaded not guilty and proceeded to a jury trial.

The jury entered a guilty verdict on November 20, 2013. The district court filed its judgment in the case on March 28, 2014. This appeal followed.

## II. DISCUSSION

### A. Constructive Amendment/Variance

Investigator Thomas Garrison testified for the United States at Defendant's trial. On direct examination, the United States inquired whether the Red Roof Inn was in close proximity to the Johnson City Motel 6. Defense counsel objected, arguing that the superseding indictment charged a conspiracy to possess with intent to distribute crack cocaine beginning on or about June 24. Any allegation that drugs were dealt out of the Red Roof Inn on another date would therefore be outside the scope of the indictment. The district court overruled the objection, concluding that the evidence was "relatively close in time and appears to be evidence related to acts that were part and parcel of and in furtherance of the conspiracy charged in the indictment."

On appeal, Defendant contends that the United States constructively amended the superseding indictment by introducing Marquesha Jones's testimony concerning drug distribution at the Johnson City Red Roof Inn on June 23, 2011. Defendant emphasizes that the date specified in the indictment was June 24, 2011, which encompassed only activities at the Johnson City Motel 6. Def.'s Br. 26.

As an initial matter, we clarify that Defendant's argument implicates a variance, not a constructive amendment. "[A] defendant can prove a constructive amendment only by pointing to a combination of evidence *and* jury instructions that effectively alters the terms of the indictment . . . ." *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006). Because Defendant

points only to "[e]vidence . . . presented at trial concerning controlled substances activities at a different Johnson City motel a day earlier," Def.'s Br. 25, he does not allege a constructive amendment, but rather a variance. *See Hynes*, 467 F.3d at 962 ("[D]efendants can establish a variance by referring exclusively to the evidence presented at trial.").

A variance "occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008). Unlike a constructive amendment, a variance is not *per se* prejudicial. *Id.* "To obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a defendant must satisfy a two-prong test: (1) the variance must be demonstrated and (2) the variance must affect some substantial right of the defendant." *United States v. Budd*, 496 F.3d 517, 521-22 (6th Cir. 2007). We evaluate variances from an indictment *de novo*. *Id.*

Evidence of drug activity at the Red Roof Inn did not prove facts materially different from those alleged in the indictment. The superseding indictment alleged that Defendant and his compatriots conspired to possess with intent to distribute crack cocaine "on or about June 24, 2011." "When 'on or about' language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established." *United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989).

In the instant case, Jones's trial testimony described one continuously flowing enterprise that occurred over the course of two nights. Jones recounted how Defendant and his co-conspirators transported crack cocaine from Knoxville to Johnson City, arriving at the local Red Roof Inn early on June 23. On that date, Jones observed Defendant package and distribute drugs at that motel. She explained that once the group sold out of crack cocaine, Defendant and three

co-conspirators returned to Knoxville in order to resupply, and then drove back to Johnson City. Jones described how the co-conspirators feared increased attention at the Red Roof Inn, so they shifted their operations over to a neighboring Motel 6 on the morning of June 24.

Here, the only "fact" purportedly creating a separate conspiracy was the use of a different motel, but the reason that the conspirators changed motels in the first place was to keep the original conspiracy operating. Because the events of June 23 were part of the same conspiracy as those of June 24, Jones's testimony concerning drug activity at the Red Roof Inn did not create a fatal variance. *See United States v. Manning*, 142 F.3d 336, 338-40 (6th Cir. 1998) (finding that evidence of an August 4, 1995 meeting between the defendant and two other individuals to discuss a cocaine deal did not create a fatal variance, even though the indictment alleged that the defendant participated in a drug conspiracy "on or about" September 6 to 12, 1995, because the August 1995 meeting "related to" the drug negotiations and sales that occurred in September 1995).

## B. Evidentiary Rulings During Trial

Defendant next argues that the district court "made several evidentiary rulings that resulted in the introduction of inadmissible evidence, or evidence the probative value of which was outweighed by one or more of the dangers listed in FRE 403." Def.'s Br. 27.

"An appellate court reviews all evidentiary rulings—including constitutional challenges to evidentiary rulings—under the abuse-of-discretion standard." *United States v. Schreane,* 331 F.3d 548, 564 (6th Cir. 2003) (citing *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141 (1997)). An abuse of discretion will be found upon a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (quoting *Super Sulky, Inc. v. U.S. Trotting Ass'n,* 174 F.3d 733, 740 (6th Cir. 1999) (internal quotation marks and citation omitted)).

However, when a defendant fails to object to an error at trial, appellate review is only for plain error. *See* Fed. R. Crim. P. 30(d), 52(b); *United States v. Lawrence*, 735 F.3d 385, 401 (6th Cir. 2013). "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (citations omitted).

### 1. Admission of Police Encounter Audio

Because two of the officers involved in the June 24 encounter at the Motel 6 wore video-recording devices on their uniforms, Defendant moved to "suppress" all audio-visual records of law enforcement activities in his case before trial.[2] Defendant alleged the audio-visual recordings of him being restrained after the officers entered Room 231 created a danger of undue prejudice that outweighed their limited probative value. While the United States did not intend to offer the entire recording into evidence, it argued that portions of the video were particularly relevant to show "which defendants were present in [Room 231], the relative location of the defendants in the room, [and] the location of contraband." The magistrate judge ordered the United States to excerpt the recordings to show only the portions that would be presented at trial. The magistrate judge then reviewed the excerpted recordings and denied Defendant's motion, determining that the recordings were not unfairly prejudicial because they "show[ed] nothing the officers themselves could not testify about." However, the magistrate judge reserved the final determination of admissibility to the trial judge because the recordings could become unnecessarily cumulative of the officers' testimony.

---

[2] As the magistrate judge correctly noted, this motion is more appropriately construed as a motion in limine.

Immediately before trial, defense counsel stated that he viewed the video excerpts again and had no objection to the video being shown, but did object to admitting the audio recorded before Defendant and Jamica Woods, one of the co-conspirators present in Room 231, were given a *Miranda* warning. That audio captured Woods's statement to Investigator Garrison that the group had come from Knoxville to shop in Johnson City, as well as the officer's response that people in Johnson City typically went to Knoxville to shop. The district court denied the motion because Defendant waived the issue by failing to raise it in a timely pretrial motion. Alternatively, the court held that the audio would be admissible as a co-conspirator's statement under Federal Rule of Evidence 801(d)(2)(E). The video excerpts preapproved by the magistrate judge were admitted into evidence without objection during trial.

On appeal, Defendant claims that the district court improperly admitted the pre-*Miranda* audio capturing the verbal exchange between Investigator Garrison and Woods after the police entered Room 231. Def.'s Br. 27.

A motion to suppress evidence must be raised before trial. Fed. R. Crim. P. 12(b)(3)(C). "Failure to do so 'by the deadline the court sets under Rule 12(c)' constitutes waiver of the defense by the party." *United States v. Coss*, 677 F.3d 278, 283 (6th Cir. 2012) (quoting Fed. R. Crim. P. 12(e)). Yet, "[f]or good cause, the court may grant relief from the waiver." Fed. R. Crim. P. 12(e).

While Defendant does not argue "good cause," he maintains that he raised the suppression issue in a pretrial motion. Def.'s Br. 28. Defendant did file a motion "to suppress all audio-visual records of law enforcement activities in this case on June 24, 2011, at or in a room at the Motel 6 in Johnson City, Tennessee." But his brief in support of that motion made no mention of the need to suppress the conversation between Investigator Garrison and Woods,

focusing solely on the unfair prejudice that would arise if recordings of Defendant being restrained and *Mirandized* were admitted at trial. Defendant therefore failed to make his current argument in the pretrial motion. "Even when a party has brought a pretrial suppression motion, . . . any new suppression arguments raised for the first time on appeal that were not contained in the original suppression motion will be deemed waived under Rule 12(e)." *United States v. Lopez-Medina*, 461 F.3d 724, 738 (6th Cir. 2006). The district court thus correctly denied Defendant's motion.

## 2. Admission of Motel Room Key Cards

After entering Room 231 and handcuffing Defendant, Investigator Garrison asked Defendant for his name. Defendant said, "Joshua Roberts, my ID is in my back pocket." At a pretrial motion hearing, Investigator Garrison testified that Defendant eventually "stood up and turned his right hip toward Officer Garrison, clearly indicating that Garrison should reach into his hip pocket to retrieve the identification." Defendant testified at trial that he "told" Investigator Garrison to "get it out" of his back pocket. Investigator Garrison did so, pulling out a wallet and two plastic motel key cards that were sandwiched up against the wallet. Defendant had one key card for Room 109 and another for Room 231. Investigator Garrison asked what the keys were for, and Defendant responded, "[F]or this room." Investigator Garrison subsequently *Mirandized* Defendant. Investigator Garrison testified that he eventually gave the room keys back to the motel management, but Defendant testified that Investigator Garrison "just showed them to the other police officer, and he gave them back to [Defendant]."

Before trial, Defendant moved to suppress evidence of motel room key cards seized from him on June 24, and to suppress any evidence derived from questioning him on that date, arguing that the questioning of Defendant and search of his person exceeded the scope of *Terry v. Ohio*,

392 U.S. 1 (1968). The magistrate judge held an evidentiary hearing and recommended that the motion be denied, concluding that no search had occurred because the motel key cards were inadvertently discovered when Investigator Garrison followed Defendant's invitation to retrieve his identification. Defendant objected to that recommendation, arguing that Investigator Garrison lacked any basis to recognize the key cards as incriminating, so he should have left the key cards where they fell or restored them to Defendant's pocket. The district court reviewed this issue *de novo* and denied Defendant's motion, adopting the magistrate judge's recommendation.

Defendant contends that the court erred in denying his motion to suppress the motel room key cards found in his pocket. Def.'s Br. 29. Defendant makes three arguments on appeal. First, Defendant argues that the search of Defendant's back pocket exceeded the scope of *Terry v. Ohio.* Def.'s Br. 30. Second, because Defendant was handcuffed behind his back and had officers freely ask him questions, Defendant argues that he was "subjected to coercion that rendered his self-identification and what followed, including his invitation to a law enforcement officer to go fishing in his pocket, subject to suppression." Def.'s Br. 30. Third, Defendant argues that the seizure of those key cards was impermissible because they were not "apparently incriminating." Def.'s Br. 29.

"The grant or denial of a motion to suppress is a mixed question of fact and law. On appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo.*" *United States v. Fisher*, 745 F.3d 200, 202 (6th Cir. 2014). A factual finding is clearly erroneous "when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007) (internal quotation and citation omitted). "When the district court has denied the motion to suppress, we review all evidence in a

light most favorable to the Government." *United States v. Coffee,* 434 F.3d 887, 892 (6th Cir. 2006) (internal quotation and citation omitted).

*Terry v. Ohio* "permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005); *see also Terry*, 392 U.S. at 20-22. *Terry* similarly permits a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." 392 U.S. at 27.

Defendant does not dispute the legality of his detention, but rather asserts that the search leading to the discovery of the key cards exceeded the scope of *Terry* because it was not reasonably designed to discover harmful contraband. Def.'s Br. 30. But Defendant incorrectly presumes that the search of his back pocket, which led to the discovery of the key cards alongside Defendant's wallet, was part of a *Terry* search. Instead, as the district court found, Defendant consented to Investigator Garrison's reaching into his pocket in order to remove Defendant's identification. "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *United States v. Jenkins,* 92 F.3d 430, 436 (6th Cir. 1996) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). "The consent must be freely and voluntarily given, and this must be proven by 'clear and positive' proof." *United States v. Kelley*, 913 F.2d 261, 265 (6th Cir. 1990) (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977)).

Defendant clearly consented to the search of his pocket. In a preliminary motion hearing, Investigator Garrison testified that after he handcuffed Defendant, he asked Defendant for his name. Defendant gave his name and told Investigator Garrison that his identification was in his back pocket. Defendant then stood up and turned his right hip toward Investigator Garrison, indicating

that Investigator Garrison should reach into Defendant's hip pocket and retrieve the identification. At trial, Defendant also testified that he "told" Investigator Garrison to get the identification out of his pocket. Accordingly, the search of Defendant's pocket to retrieve his identification was consensual. *See United States v. Canipe*, 569 F.3d 597, 604 (6th Cir. 2009) (holding that search of vehicle was consensual when defendant "responded positively and unambiguously"); *see also United States v. Thurman*, 525 F. App'x 401, 404 (6th Cir. 2013) (concluding that search of glove box was consensual when defendant responded to officer's inquiry to search by reaching into his pocket and handing the officer his keys).

Defendant relies on *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011), to argue that his detention created a coercive environment and vitiated his consent. In that case, we determined that police coercion negated a defendant's consent because the defendant consented immediately after an officer placed his hands on the defendant's body in order to conduct a frisk, and the defendant was repeatedly prevented from exercising his right to walk away from the police. *Id.* at 572. *Beauchamp* is inapplicable. Unlike the officer in that case, Investigator Garrison did not place his hands on Defendant's body immediately before Defendant provided consent.[3] Instead, Defendant volunteered his consent *before* Investigator Garrison even had to ask to search Defendant's pocket. And while it is true that Defendant was handcuffed at the time he gave consent, the fact a defendant is handcuffed at the time consent is provided does not automatically negate that consent. *See United States v. Burns*, 298 F.3d 523, 541 (6th Cir. 2002) (holding that consent was freely given by handcuffed defendant because of the "calm and cordial nature" of the police interaction).

---

[3] Before Investigator Garrison requested Defendant's ID, he had conducted a pat-down search of Defendant, removing cigarette lighters and keys from Defendant's pockets. Time passed, however, between the pat-down and Defendant's consent.

After Investigator Garrison reached into Defendant's back pocket and removed a wallet, two key cards came out with it. Defendant argues that the "seizure" of those key cards was illegal because they were not apparently incriminating. Def.'s Br. 30. But Defendant's argument fails because a seizure never occurred within the meaning of the Fourth Amendment. A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Bonds v. Cox*, 20 F.3d 697, 701 (6th Cir. 1994) (quoting *Soldal v. Cook Cnty.,* 506 U.S. 56, 61 (1992)). Investigator Garrison did not meaningfully interfere with any possessory interest Defendant had in those key cards. "Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be . . . minimally intrusive of Fourth Amendment interests . . . ." *United States v. Place*, 462 U.S. 696, 706 (1983). An interference is not "meaningful" when it is short in duration and non-invasive. *See, e.g.*, *United States v. Robinson*, 390 F.3d 853, 869-70 (6th Cir. 2004) (determining that diversion of package for brief investigation "did not constitute a . . . seizure"); *United States v. Lovell*, 849 F.2d 910, 916 (5th Cir. 1988) (holding that the "momentary delay" caused by the removal of defendant's bags from a conveyor belt "was insufficient to constitute a meaningful interference with [defendant's] possessory interest in his bags").

The record indicates that any interference with Defendant's possessory interest in the key cards was temporary and non-invasive. Investigator Garrison testified that he returned the key cards to motel management, and Defendant testified that Investigator Garrison returned the key cards to him after briefly showing them to another officer. Under either scenario, the interference was not meaningful. *Compare United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997) (finding no meaningful interference with defendant's possessory interest in a bag when officers moved the bag a short distance for a short time), *with Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308

F.3d 523, 546 (6th Cir. 2002) (concluding that four-day detention of green cards interfered with plaintiffs' possessory interests in the documents).

### 3. Cross-Examination About Crack Cocaine

Defendant testified in his defense at trial. He admitted the existence of a prior felony conviction, but he did not state the nature of that conviction. When Defendant described his trips between Johnson City and Knoxville, defense counsel asked Defendant whether he saw "any cocaine base." This exchange followed:

> Defendant: No, sir, not at all
> Counsel: Do you know what cocaine base is?
> Defendant: Yes, sir.

On cross-examination, the United States inquired into Defendant's prior felony conviction. Defense counsel objected, and the district court excused the jury. The court sustained the objection, determining that the nature of Defendant's prior state conviction for possession with intent to sell cocaine posed a risk that the jury would draw an improper propensity inference.

The court also addressed Defendant's "somewhat problematic testimony" regarding his knowledge of crack cocaine. It held that the United States "would be allowed to ask some limited questions about the extent of [Defendant's] knowledge" because Defendant "opened th[e] door." When cross-examination resumed, the United States asked Defendant if he knew what crack cocaine looked like because he had previously handled and sold the drug. Defendant answered affirmatively.

On appeal, Defendant argues that he "did not open any door" to further cross-examination about crack cocaine because his counsel "implicitly distinguished between base and powder cocaine." Def.'s Br. 31. Defendant additionally claims that the basis for his knowledge about crack cocaine "never became relevant to anything but jurors' prejudices," converting prior conviction evidence into propensity evidence. Def.'s Br. 31.

"Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). But the "subject matter of the direct examination" is "liberally construed to include all inferences and implications arising from such testimony." *United States v. Moore*, 917 F.2d 215, 222 (6th Cir. 1990).

The district court did not err in ruling that limited questions about "the extent of [Defendant's] knowledge" about crack cocaine were within the permissible scope of cross-examination under Rule 611. The "elicited testimony [on cross-examination] . . . was reasonably related to the inferences drawn from . . . direct [examination] testimony." *Id.* at 222. On direct examination, Defendant stated that he did not see crack cocaine at the Motel 6 and that he knew what crack cocaine was, which necessarily implied that he had seen crack cocaine at some point in his lifetime. The United States' cross-examination about Defendant's familiarity with crack cocaine was a logical extension of Defendant's direct examination testimony. *See id.* (finding that cross-examination testimony implicating two co-defendants in a post office robbery did not exceed the scope of direct examination testimony that admitted general knowledge of a March 1987 post office robbery); *see also United States v. Coleman*, 453 F. App'x 640, 643 (6th Cir. 2011) (holding that "natural inferences" drawn from direct examination must be addressed to avoid juror confusion); *United States v. Musick*, 291 F. App'x 706, 728 (6th Cir. 2008) (determining that direct examination about a defendant's juvenile detention opened the door to cross-examination about the search and evidence that precipitated the detention).

Defendant also argues that the inquiry into whether he had previously sold crack was improper "propensity evidence" that was not probative of any issue "relevant to anything but jurors' prejudices." While Defendant is correct that the inquiry into his past sales of cocaine was not permissible under Rule 404(b), the error in this case was harmless.

The admissibility of Rule 404(b) evidence is governed by a "three-step analysis." *United States v. Mack*, 729 F.3d 594, 601 (6th Cir. 2013) (citing *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012)). The first inquiry is whether there is sufficient evidence that the other act actually occurred. *Id.* Here, neither party disputes Defendant's prior sales of crack. The second inquiry, which is a pure question of law, is "whether the evidence is probative of a material issue other than character." *Id.* The third inquiry, reviewed for abuse of discretion, is "whether any unfair prejudice generated by the other act evidence is substantially outweighed by its probative value." *Id.*

We have insisted that the issue sought to be proven by a criminal defendant's prior bad acts must be legally material before the evidence of other acts may be admitted under 404(b). *United States v. Johnson*, 27 F.3d 1186, 1191-92, 1194 (6th Cir. 1994). The government argues that the prior sales of crack cocaine were relevant to prove Defendant's knowledge of its appearance and that establishing this knowledge could rebut a potential inference the jury might draw that he failed to recognize the substance as crack. This is not sufficient to create a legally material issue. Defendant stated outright that he knew what cocaine base looked like. Nothing in his testimony suggested that he failed to recognize the substance; rather, he testified that "only when the police found it" in their search of the hotel room did he see any crack during the group's trip to Johnson City. *Compare Johnson*, 27 F.3d at 1194 ("Knowledge is a 'material issue' when the defendant claims he was unaware that he was committing a criminal act.").

Even setting aside the question of whether the evidence was probative of a material issue, it should have been excluded under the third inquiry, which coincides with Rule 403. The unfair prejudice of forcing Defendant to admit that he had previously committed the same crime he was now charged with unquestionably outweighed any residual probative value of clarifying for the

jury that Defendant truly knew, as he had already testified, what cocaine base looked like. "'Probity in this context is not an absolute; its value must be determined with regard to the extent to which the [material issue] is established by other evidence, stipulation or inference.'" *United States v. Jackson*, 339 F.3d 349, 356 (5th Cir. 2003) (quoting *United States v. Beechum*, 582 F.2d 898, 914-15 (5th Cir. 1978)). Defendant's own testimony had already established his knowledge of the drug's appearance, and the issue was not otherwise significant in the case. The incremental probative value was negligible at best. On the other hand, the prosecution's questioning invited the jury to conclude that Defendant had sold drugs before and therefore likely sold them here, precisely the inference forbidden by 404(b)(1). *Johnson*, 27 F.3d at 1193 ("When jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is one trial, the information unquestionably has a powerful and prejudicial impact.").

While the questioning should not have been allowed, we are convinced that the error was harmless in this case. The other evidence against Defendant, including the damning testimony by his co-conspirator and the evidence related to the discovery of crack in the hotel room, was so substantial as to be overwhelming.

### 4. Cross-Examination About Marijuana

At trial, the United States asked Defendant what he and the rest of the group were doing before the police arrived at their motel room. When Defendant answered, "Just watching TV," the United States inquired whether Defendant and the others were smoking marijuana during that period. Defendant replied, "No, sir." Defense counsel asked to approach the bench, but the court overruled that request. The United States then asked Defendant if he denied that the

officers "walked into a haze of marijuana smoke" when they entered Room 231. Defendant did not deny that assertion, but clarified that only Turner was smoking marijuana.

Defendant argues that this cross-examination about smoking marijuana in the Motel 6 was unfairly prejudicial because Defendant was charged with participating in a crack cocaine conspiracy, not a marijuana-based offense. Def.'s Br. 32. Though the parties disagree as to whether defense counsel properly objected, we need not decide whether the standard of review is plain error or abuse of discretion. The claim lacks merit even under the abuse-of-discretion standard.

Cross-examination may implicate "matters affecting the witness's credibility." Fed. R. Evid. 611(b). "We have repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences." *United States v. Markarian*, 967 F.2d 1098, 1103 (6th Cir. 1992) (quoting *United States v. Havens,* 446 U.S. 620, 626-27 (1980)).

The district court did not abuse its discretion in permitting the cross-examination on marijuana use. By falsely stating that he and his co-conspirators were merely watching television before the police entered Room 231 and then explicitly denying that marijuana was being smoked in that room, Defendant opened the door for the United States to impeach his credibility. *See Markarian*, 967 F.2d at 1103 (holding that prosecution could ask witness about defendant's experience with cocaine after defendant denied selling any controlled substances on direct and cross-examination). Nor did eliciting this testimony unfairly prejudice Defendant. Evidence of marijuana use in Room 231 was relevant to explain why the police entered the room in the first place. *See id.* (concluding that trial court properly exercised discretion when determining the probative value of impeachment evidence outweighed any prejudicial effect).

## C. Motion for a Mistrial

At trial, the United States asked Defendant, without objection, if he was a member of the Gangster Disciples, which Defendant denied. The United States then inquired whether Defendant had "a tattoo on [his] neck of a six pointed star." Defense counsel objected, arguing that evidence of gang affiliation was "totally irrelevant in [Defendant's] case." Defense counsel feared that a cautionary instruction would not be enough and moved for a mistrial. The United States asserted that gang membership was relevant to an individual's credibility. The court recognized that a jury might infer that Defendant likely committed the criminal act in question because people who belong to gangs commit criminal acts, but felt that a cautionary instruction would not do "anything other than draw further attention to that matter." However, the court determined that the question about whether Defendant was a Gangster Disciple and Defendant's subsequent denial were not prejudicial because the exchange was limited in scope and duration. The court denied Defendant's request for a mistrial but still offered to provide a cautionary instruction if Defendant requested one. The court acceded to Defendant's request and told the jury that the gang affiliation question and answer were irrelevant and not to be considered for any purpose.

Defendant contends that this inquiry constituted prosecutorial misconduct. Def.'s Br. 33. Defendant claims that "[i]n the context of a trial in which [Defendant] was the only individual on trial, all of the co-defendants had entered into negotiated pleas, and the only alleged co-conspirator who took the stand did so as a witness for the Government, . . . the only reason for this questioning was to inflame the jury." Def.'s Br. 34.

We review the denial of a motion for mistrial for abuse of discretion. *United States v. Fields*, 763 F.3d 443, 462 (6th Cir. 2014). We consider five factors when determining whether a

-19-

mistrial was warranted following an improper reference during trial: "(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant." *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003).

While the prosecutor's line of questioning was certainly improper, a mistrial was not warranted. The short exchange between Defendant and the United States was negligible, likely lasting less than a minute, with Defendant saying merely two words. The district court correctly reasoned, "[T]he only thing in front of the jury at this point is that there's a question about whether [Defendant is] a gang member, and his answer is no. I don't see how that answer can be prejudicial." Such a limited exchange could not taint Defendant's entire trial. Furthermore, while the United States' line of questioning may have been unreasonable, it did not necessarily evidence any bad faith. As the prosecutor indicated to the district court, the National Drug Intelligence Center had released information on various gangs, including the Gangster Disciples, and Defendant was wearing a turtleneck during trial in an attempt to cover up a Gangster Disciples neck tattoo. The prosecutor certainly made a tenuous connection, but it was not so divorced from reality as to indicate that the prosecutor was "piling on" out of bad faith. A mistrial is not warranted if "there is no showing that the government acted in bad faith or otherwise 'deliberately injected' . . . stray remarks." *United States v. Hernandez*, 873 F.2d 925, 928 (6th Cir. 1989). Finally, the district court minimized any prejudicial effect arising from the question and response with an immediate, clear, and forceful limiting instruction:

> [Defendant] was asked about his possible membership in any gang; and he answered that question, no, that he was not a member of the gang. Both the question and his answer are irrelevant in this case. You should not consider either the question or the answer for any purpose in this case.

This limiting instruction adequately removed the risk of prejudice to Defendant. *See United States v. Forrest*, 17 F.3d 916, 921 (6th Cir. 1994) (holding that the "clear admonition by the judge and the ample other evidence of guilt determine that a mistrial is not mandated"). Accordingly, the district court likely did not abuse its discretion in denying Defendant's motion for a mistrial.

### D. Misconduct During Closing Argument

During closing arguments, defense counsel argued that "the evidence presented to [the jury] by the law enforcement officers and the evidence presented by [Defendant] are consistent." Defense counsel also urged the jury to "ask [themselves] whether [Defendant] was straightforward with [them] from that stand, including about some facts that he's probably not proud of." Defense counsel recognized that there was a "conflict" between the testimony of co-conspirator Jones and Defendant, but asserted that Jones was not credible.

The prosecutor responded in rebuttal, inviting the jury to question Defendant's credibility. He noted that Defendant did not admit to selling crack cocaine until he was cross-examined. He also asked the jury to consider whether "there was any liquor found in those [motel] rooms" in light of Defendant's testimony about drinking during his stay in Johnson City,[4] implying that because law enforcement did not find any alcohol, Defendant lied about drinking. The prosecutor rehabilitated Jones's credibility as well, stating that she came forward and admitted her guilt. Furthermore, he highlighted the fact that Jones was not a convicted felon, unlike Defendant, and that Jones confessed to having a drug addiction.

---

[4] On direct examination, Defendant explained that he and Jamica Woods, his girlfriend, slept in the same room, but Woods "left maybe two or three times" to get liquor from the room of co-conspirators Shanna Clark and Marquez Holloway.

Defendant states that his conviction should be reversed because the United States made "improper" closing arguments. Def.'s Br. 34. Specifically, Defendant contends the United States offered a "misleading and unfairly prejudicial" argument when it invited the jury to judge Defendant incredible because there was no physical evidence of liquor in the Motel 6, even though Defendant's testimony concerning alcohol referred to drinking at the Red Roof Inn. Def.'s Br. 34. Defendant further contends that the United States untruthfully stated that Jones was not a convicted felon, and it improperly and prejudicially "vouch[ed] for the credibility of . . . Jones as a cooperating co-defendant." Def.'s Br. 34-35.

Because Defendant did not object to the statements made during closing argument, we review only for plain error. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). The court employs a two-part test when evaluating claims of prosecutorial misconduct based on improper statements during closing argument. *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003). The court first determines "whether the remarks were indeed improper." *Id.* If they were improper, the court then "determine[s] if the remarks were flagrant and warrant reversal." *Id.* The court addresses four factors in determining flagrancy: "1) whether the statements tended to mislead the jury and prejudice the defendant; 2) whether the statements were isolated or pervasive; 3) whether the statements were deliberately placed before the jury; and 4) whether the evidence against the accused is otherwise strong." *Id.* No single factor is dispositive, and even if the court does not find the remarks flagrant, it "will nonetheless reverse a conviction upon a determination that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense objected to the statements; and 3) the trial judge did not cure the impropriety through an admonishment to the jury." *Id.* At the same time, we "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a

whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *Henry*, 545 F.3d at 377 (quoting *United States v. Young,* 470 U.S. 1, 11 (1985)).

The district court did not plainly err by allowing the prosecutor to make statements about the presence of liquor at the Motel 6 and Jones's status as a convicted felon during closing arguments. First, the statements were not improper. The prosecutor asked the jury to consider whether the police found liquor in the searched Motel 6 rooms in order to impeach Defendant's story about drinking alcohol the night before. While it is true that Defendant testified only about drinking liquor at the Red Roof Inn on the first day the co-conspirators spent in Johnson City, Defendant never claimed that liquor was consumed *only* at the Red Roof Inn. Indeed, on cross-examination, while discussing events that occurred at the Motel 6, the prosecutor asked Defendant whether "during your stay somebody had some liquor," and Defendant confirmed that co-conspirators Clark and Holloway had liquor. Based on Defendant's testimony, it was reasonable to infer that liquor was present in the Motel 6 room. *See United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007) (noting that government's comments during closing arguments "drew a reasonable inference based on the evidence" given at trial). The prosecutor also stated that Jones, unlike Defendant, was not a convicted felon. Of course, Jones pleaded guilty prior to the trial, so she was a convicted felon at the time of this closing argument. But she did not have a felony conviction *prior* to this case. That is why the prosecutor told the jury that Jones "did plead guilty to a lesser amount."

Second, even if the prosecutor's statements were improper, they were not flagrant. In the context of the trial as a whole, two comments made by the prosecutor in passing were unlikely to have a great effect on the jury. *See United States v. Mahar*, 801 F.2d 1477, 1502-03 (6th Cir.

1986) (holding that prosecutor's three improper comments made during closing arguments did not constitute misconduct so pronounced and persistent that it permeated the entire atmosphere of the trial).

Nor did the prosecutor improperly and prejudicially "vouch for the credibility of Marquesha Jones as a cooperating co-defendant." Def.'s Br. 34-35. Improper vouching occurs when a prosecutor either (1) bluntly states a personal belief in a witness's credibility, "thereby placing the prestige of the office of the United States Attorney behind that witness," or (2) "implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *Henry*, 545 F.3d at 378-79 (quoting *United States v. Francis,* 170 F.3d 546, 550-51 (6th Cir. 1999)). The prosecutor in this case did neither. He merely told the jury to consider various factors in assessing Jones's credibility based on her testimony: the fact that Jones came forward and admitted her guilt, the fact that she was not a convicted felon prior to this prosecution, the fact that she admitted unsavory things like her prescription pill addiction, and the fact that her testimony was consistent with the testimony of other witnesses. At no point did the prosecutor state a personal belief in Jones's credibility or raise evidence unavailable to the defense. Accordingly, the district court did not err by allowing those remarks.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.